Filed 12/12/22  P. v. Stelle CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B322499 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. INF1500499) |
| v. | |
| STANFORD JAMES STELLE III, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 23, 2022, be modified as follows:

1. On page four, in the second sentence of the second full paragraph, replace the semicolon with a comma, and

insert after that comma, "the charging documents, a police report regarding the molestation, and defendant's police interview," so that the full sentence reads:

> Dr. Leitman wrote a four-page report based solely on an interview with defendant, the charging documents, a police report regarding the molestation, and defendant's police interview.

2. In the fourth sentence of the same paragraph (also on page four), which begins, "Because," delete the second word, "defendant," and replace it with "defendant's answers indicated a lack of 'knowledge about important aspects of the legal system' and because he," such that the sentence reads:

> Because defendant's answers indicated a lack of "knowledge about important aspects of the legal system" and because he gave "some bizarre responses" during that interview—including that he "lived in bushes," "loves to ride horses," and has problems remembering things—Dr. Leitman opined that defendant "would not be able to cooperate with his attorney" in his defense.

3. In the immediately following sentence (also on page 4), which begins, "Dr. Clark," insert "in her nine-page report" after the first "and," so that the sentence reads:

Dr. Clark also interviewed defendant, and in her nine-page report observed that he had "poor eye contact," a "flat" "affect," and what appeared to be "impaired" "memory function" during that interview.

4. Delete the sentence that begins at the end of page four and continues onto page five— beginning, "In November 2015"—and replace it with the following sentence:

   In November 2015, the parties stipulated that the trial court may base its finding of incompetency to stand trial on Dr. Leitman's and Dr. Clark's reports.

5. In the sentence that immediately follows (on page five), replace "Based on that stipulation, the" with "The," and insert "consequently" after "court," so that the sentence reads:

   The court consequently found defendant "mentally incompetent to stand trial" and suspended the criminal proceedings.

6. At the end of page nine, in the first part of the first sentence following the bullet point labeled *Testimony of Dr. Jones*," replace the phrase "that the prior diagnosis of malingering was still valid," with "his prior opinion that defendant was likely malingering," so that the beginning of that sentence reads:

> Dr. Jones did not reexamine defendant, but reaffirmed his prior opinion that defendant was likely malingering because . . .

7. In the same sentence as immediately above (but on page 10), after the comma that precedes, "(2) Dr. Gilewski's diagnosis," add a footnote and renumber the subsequent footnotes accordingly. The footnote should read as follows:

> **3** Although Dr. Jones acknowledged that he had not "seen [the] norms for autistic individuals" (that would place defendant on "some type of autism scale"), he went on to testify that defendant "appeared to be able to concentrate and to engage" in a way that "an autistic person . . . lost in their thoughts way out here . . . might not be able to do."

8. Also in the same sentence as immediately above (on page 10), insert between "(6) defendant's" and "neurocognitive disorder" the following: "medical records 'indicate[d]' that his," so that the last part of that sentence reads:

> and (6) defendant's medical records "indicate[d]" that his neurocognitive disorder was *not* progressive.

9. Delete the first full sentence on page 11, which begins, "However, Dr. Jones testified," and replace it with the following sentence:

4

However, Dr. Jones testified that this email did not "impact" him in how he "approached this case" and that he was "not concerned" about defendant's release status when evaluating defendant's mental health.

10. On page 18, in the sentence immediately preceding the heading "**B.** *Analysis*," replace the word "cast" with the phrase "constitute a substantial change in circumstances or new evidence casting," so that the sentence reads:

Consequently, where the new information "substantially duplicates evidence already considered at" the prior hearing or any change entails "minor changes in the defendant's mental state," it does not constitute a substantial change in circumstances or new evidence casting a serious doubt on the prior finding and does not warrant convening a new competency hearing.

11. In the third full paragraph on page 20, in the second sentence, which begins, "There is also no support," insert a fourth footnote after "*Brady v. Maryland* (1963) 373 U.S. 83," and renumber subsequent footnotes accordingly. The footnote should read:

4 Because a prosecutor's duty under *Brady* to disclose "favorable" evidence to the defense encompasses evidence that impeaches government witnesses (*Turner v. United States* (2017) 137 S.Ct. 1885, 1893), *Brady* subsumes the duty of prosecutors

5

to disclose impeachment evidence first recognized in *Giglio v. United States* (1972) 405 U.S. 150.

12. In the same sentence where the fourth footnote above is to be inserted, delete "; further, any discovery error can be harmless (*Buenrostro, supra*, 6 Cal.5th at p. 399), and as explained below, *was* harmless error," and insert the following full sentence as the third sentence of the paragraph:

Further, and contrary to what defendant argues in his petition for rehearing, the nondisclosure of favorable evidence violates *Brady* only if the evidence was "material" to the outcome of the proceeding (*People v. Beck & Cruz* (2019) 8 Cal.5th 548, 557), and violations of the Criminal Discovery Act are subject to harmless error analysis (*Buenrostro, supra*, 6 Cal.5th at p. 399); as explained below, the ex parte communication was not material to the outcome of the competency proceeding and its omission was harmless here.

13. On page 22, delete the second sentence beneath the heading labeled, "2. *October 2020 ruling not to convene a second competency hearing*," which begins, "Applying the standards," and replace it with the following sentence (leaving untouched the citation that follows the original sentence):

Applying the standards set forth above, the trial court's ruling was correct as long as substantial

6

evidence supported its findings that (1) there was no substantial change of circumstances, *or* (2) there was no new evidence casting a serious doubt on the validity of the trial court's prior, May 2019 finding of competency.

14. In the next paragraph, which is the second full paragraph beneath the heading labeled "2. *October 2020 ruling not to convene a second competency hearing*," delete the first sentence, which begins, "Even if we assume," and replace it with the following sentence:

Even if we assume that the additional evaluations defendant proffered in October 2020 qualify as a "change of circumstances" or as "new evidence," the trial court had substantial evidence to support its rulings that the evaluations did not constitute a *substantial* change in circumstances or new evidence *that cast serious doubt on the trial court's prior finding that defendant was competent to stand trial.*

15. In the sentence that begins on page 22 and continues onto page 23, delete the word "new," so that the sentence reads:

The evidence defendant proffered was largely aimed at undermining that subsidiary finding of malingering.

16. In the first full sentence on page 23, which reads "But that new evidence," delete "new evidence did not cast" and replace it with "evidence did not constitute a *substantial* change in circumstances or constitute new evidence that *casts*," so that the beginning of the sentence now reads:

> But that evidence did not constitute a *substantial* change in circumstances or constitute new evidence that *casts a serious doubt on that finding* because . . .

17. In the sentence that immediately follows (also on page 23), delete "cast no," and insert in its place, "was not a substantial change in circumstance and was not new evidence casting," so that the sentence reads:

> And because the evidence of defendant's malingering remained unassailed, the additional evidence that his feigned memory loss was getting worse was not a substantial change in circumstances and was not new evidence casting doubt on the prior finding of competency.

18. In the second full paragraph on page 23, in the second sentence, which begins with "Thus, defendant concludes," delete "cast" and insert in its place "were a substantial change in circumstances and new evidence casting," so that the sentence reads:

Thus, defendant concludes, the new diagnoses were a substantial change in circumstances and new evidence casting doubt on the trial court's prior finding of competency.

19. In the first sentence of the first full paragraph on page 24, which begins "Second, defendant argues," delete the word "new," and insert between "thereby" and "casting," the words "constituting a substantial change in circumstances and," so that the sentence reads:

Second, defendant argues that the evidence regarding the prosecutor's ex parte communication with Dr. Jones deprives his opinion of all weight, thereby constituting a substantial change in circumstances and casting serious doubt on the court's finding of malingering.

20. In the first sentence of the following paragraph (also on page 24), which begins, "Third, defendant asserts," delete the word "new"; insert "a" between "constituted" and "substantial"; and insert "change in circumstances or new" between "substantial" and "evidence," so that the sentence reads:

Third, defendant asserts that the trial court applied the incorrect analysis in assessing whether his new evidence constituted substantial evidence that casts serious doubt on the prior competency finding.

9

21. On page 25, seven lines down, in the sentence beginning, "By his argument," delete the first appearance of the word "new"; delete "casts" and insert in its place "constitutes a substantial change in circumstances or new evidence casting"; and insert after "*any*" "change in circumstances and *any*," so that the sentence reads:

> By his argument, defendant seems to suggest that a trial court may *not* evaluate or weigh whether evidence—even if accepted as true—constitutes a substantial change in circumstances or new evidence casting a serious doubt on the prior finding of competency; but accepting defendant's suggestion would mean that *any* change in circumstances and *any* new evidence—no matter how flimsy or how it fits into the overall tapestry of other evidence—would mandate a new competency hearing.

22. In the very next sentence (also on page 25), which begins "We reject this suggestion," in the portion of the sentence occurring after the semicolon: delete "substantial," and replace it with "evidence of a 'substantial' change in circumstances or of new"; and insert between "not on" and "evidence" "evidence that shows any change in circumstances or new." The sentence from the semicolon onward should read:

> *Rodas* conditions a further competency hearing on a showing of evidence of a "substantial" change in

10

circumstances or of new evidence that casts a "serious doubt" on the prior finding of competency, not on evidence that shows any change in circumstances or new evidence that merely suggests any doubt.

23. In the very next sentence, which is the last sentence of that paragraph (also on page 25), beginning, "The trial court used," insert between "level of" and "casting," "a substantial change in circumstances or new evidence," so that the sentence reads:

The trial court used the proper analysis in this case because it accepted Dr. Gilewski's and Dr. Leitman's evaluations at face value, but determined that they did not rise to the level of a substantial change in circumstances or new evidence casting serious doubt on the court's prior finding of malingering in light of the overwhelming other evidence of malingering that was unaffected by the new evaluations.

24. In the first part of the next sentence (also on page 25), which begins, "Fourth": Delete "there was" and replace it with "the new evaluations constituted a"; insert between "substantial" and "evidence," "change of circumstances or new"; delete "that the new evaluations cast," and replace it with "casting," so that the first part of the sentence reads:

11

Fourth, defendant urges that the trial court's analysis of whether the new evaluations constituted a substantial change of circumstances or new evidence casting serious doubt on the prior finding of competency was flawed because . . .

25. On page 28, in the third sentence beneath the heading "3. *April 2021 ruling not to convene a second competency hearing*," replace "'substantial evidence'" with "a substantial change in circumstances or new evidence," so that the sentence reads:

The trial court did not err in concluding that those items of evidence did not constitute a substantial change in circumstances or new evidence that "casts serious doubt" upon its prior finding of competency.

26. On page 30, six lines down, insert an additional space before the sentence beginning "What is more," so that there are two spaces between that sentence and the one preceding it.

27. In the first full paragraph on page 30, in the first sentence, replace "two" with "three," so that the sentence reads:

Defendant offers three arguments in rejoinder.

28. At the end of the same paragraph mentioned above (the first full paragraph), insert the following sentence:

Third, defendant in his petition for rehearing argues that the weak probative value of the evidence goes to its weight and not its admissibility; he is wrong, for if defendant were correct that the slight probative value of evidence could never preclude its admission, section 352 would be a nullity.

\* \* \*

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

CHAVEZ, Acting P. J.        HOFFSTADT, J.        BENKE, J.*

_____

*       Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13

Filed 11/23/22  P. v. Stelle CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STANFORD JAMES STELLE III,<br><br>        Defendant and Appellant. | B322499<br><br>(Los Angeles County<br>Super. Ct. No. INF1500499) |

APPEAL from the judgment of the Superior Court of Los Angeles County, Dale R. Wells, Judge.  Affirmed.

Dorsey & Whitney, Lynnda A. McGlinn, RJ Zayed, and Michael Rowe for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser, and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Stanford James Stelle III (defendant) stands convicted of forcing his much younger cousin to engage in sex acts from the time she was five years old until she was 12.  On appeal, he does not contest his guilt.  Instead, he argues that he was not competent to stand trial or to be sentenced.  He also argues that the trial court erred in excluding evidence of his mental state to negate the specific intent required for a subset of the sex crimes.  We conclude that his arguments lack merit, and affirm his convictions and sentence.

## FACTS AND PROCEDURAL  BACKGROUND

I.    **Facts**

A.    ***Defendant and his cousin***

Defendant was born in 1978.  He completed 11th grade.  He has access to a substantial sum of money held in a family trust.  In 2005, defendant injured the frontal lobes of his brain in a motorcycle accident.

S. Doe was born in 1998.  She is defendant's cousin.

B.    ***Defendant sexually molests his cousin for nearly a decade, despite knowing it was "wrong" to do so***

From 2003 (when S. Doe was five years old) until 2011 (when she was 13 years old), defendant sexually molested S. Doe every weekend.  Initially, defendant would massage S. Doe's chest and stick his finger in her vagina during the showers he insisted they take together.  Defendant then progressed to

2

making S. Doe lay on the floor while naked, where he would rub his penis against her vagina until he ejaculated all over her chest. Defendant eventually started to orally copulate S. Doe and to demand that S. Doe orally copulate him, even though she would choke and gag as she did so.

To ensure that S. Doe would not tell anyone else about what he called their "little secret," defendant would buy S. Doe trinkets, candy, and items of clothing.

The molestation ended in 2013. While at their grandfather's 91st birthday party that year, defendant took S. Doe into a bedroom and pulled off her pants. S. Doe urged him to stop, but he ignored her pleas. It was not until she forcefully pushed him off her and she got away from him that the years of nonstop molestation—except for the brief period when he was in the hospital after his 2005 motorcycle accident—ceased.

To family counselors, to police, and to S. Doe, defendant admitted that what he had done was "wrong," that it was "over the line," and that he would "take it back" if he could. When S. Doe called defendant in March 2015 with law enforcement covertly listening in, defendant agreed with S. Doe that he had "sexually touch[ed]" S. Doe and that it was "wrong" to do so, but refused to say anything more because he did not "want anybody else to hear what [he was] saying."

## II. Procedural Background

### A. *Initial complaint*

In March 2015, the People filed a criminal complaint against defendant alleging 14 felonies arising out of his molestation of S. Doe.

In a 2015 interview by a defense investigator, defendant stated that he knew he was charged with having sex with a

minor.  He reported that he was innocent because S. Doe's mother (defendant's aunt)—who had a "drug abuse problem"—"was trying to extort money from [him] and his family" by making up these allegations and then demanding money in exchange for keeping quiet about them.

### B.    *Adjudication of competency to stand trial*

In May 2015, and after defendant's attorney did the same, the trial court "declare[d a] doubt as to defendant's mental competence" to stand trial and suspended the criminal proceedings.

The trial court appointed two experts to evaluate defendant—Dr. Michael Leitman (Dr. Leitman) and Dr. Joy Smith Clark (Dr. Clark).  Dr. Leitman wrote a four-page report based solely on an interview with defendant; Dr. Leitman reviewed no other documentation about defendant and did not administer any tests.  Because defendant gave "some bizarre responses" during that interview—including that he "lived in bushes," "loves to ride horses," and has problems remembering things—Dr. Leitman opined that defendant "would not be able to cooperate with his attorney" in his defense.  Dr. Clark also interviewed defendant, and observed that he had "poor eye contact," a "flat" "affect," and what appeared to be "impaired" "memory function" during that interview.  Because defendant also denied knowing anything about the legal process, Dr. Clark opined that a "question remains whether there is some cognitive impairment or deficit," but that "malingering"—that is, the possibility that defendant was pretending to have mental competency issues—"cannot be completely ruled out."

In November 2015, the parties stipulated to a finding that defendant was not competent to stand trial based on Dr.

Leitman's and Dr. Clark's reports. Based on that stipulation, the court found defendant "mentally incompetent to stand trial" and suspended the criminal proceedings.

From November 2015 until November 2019, defendant was housed in two mental health facilities. Those facilities provided the following progress reports:

- *March 2016 report.* In a report dated March 2016, the first facility reported that defendant was "not yet competent to stand trial." The report indicated that defendant likely suffers from "cognitive deficits" such as having "poor concentration" and being "forgetful," but that he was also malingering insofar as he was "exaggerating secondary symptoms [of those deficits] for [his personal] gain." Specifically, the report documented that defendant's results on the Test of Memory Malingering (TOMM) "indicate[d] [defendant] was very likely exaggerating memory impairment at the time of testing." The report further cited defendant's inability to remember his own age as providing additional evidence of his exaggeration of his memory deficits.

- *August 2016 report.* In a report dated August 2016, the second facility reported that defendant was not yet competent to stand trial because he was "unable to demonstrate adequate knowledge" regarding court proceedings. Like the prior report, this report diagnosed defendant as having a "[m]ajor [n]eurocognitive [d]isorder due to [the] [t]raumatic [b]rain [i]njury" from his 2005 accident, but that defendant was malingering by "exaggerat[ing] his deficits." Specifically, the report noted that defendant "has great difficulty expressing himself to his treatment providers but he speaks rapidly and confidently" to his fellow inmates and to persons on the phone.

- *March 2017 report.* In a report dated March 2017, the second facility relayed that defendant was still not competent to stand trial due to his lack of understanding of the nature of the charges against him. Despite staff working with defendant with flashcards to teach him court procedure, defendant continued to express no knowledge. The report noted that defendant's "brain injury has left him with a somewhat odd presentation at times, which in a psychiatric setting, may be mistaken for mental illness."

In September 2017, the second facility certified to the trial court that defendant was competent to stand trial, and submitted an assessment letter in support of its certification. In the letter, the facility diagnosed defendant with (1) a "[m]ajor [n]eurocognitive [d]isorder, [d]ue to a [t]raumatic [b]rain [i]njury," resulting in "[m]ild" "behavioral disturbances," and (2) "malingering" because he was "intentionally" "exaggerating" the "genuine cognitive impairments" caused by his neurocognitive disorder. The letter set forth three reasons for its finding of malingering: (1) defendant was exaggerating his lack of knowledge about legal processes because his reported mastery of court-related information had "actually worsened," which "does not make sense from a neurocognitive standpoint," (2) defendant was "feigning some cognitive and memory problems" because his lack of memory was "selective," insofar as he would accurately remember certain "names and events" and "provide details," but would purport to not remember anything about the charges against him or the legal process, "despite this being the focus of treatment for the past 14 months," and (3) defendant would act forgetful and nonresponsive when being evaluated, but was

6

"observed speaking rapidly and confidently while using the telephone and while speaking with his peers."

After receiving the certification, the trial court appointed Dr. William Jones (Dr. Jones) to evaluate defendant's competency to stand trial. Dr. Jones reviewed a January 2019 evaluation prepared by an expert retained by defendant named Dr. Michael Gilewski (Dr. Gilewski). In that report, Gilewski opined that defendant had a (1) "severe attention, memory, and executive functioning impairment," and (2) a "prior diagnosis . . . for [a]utism [s]pectrum [d]isorder." Dr. Jones agreed with Dr. Gilewski that defendant had a genuine neurocognitive disorder stemming from the 2005 brain injury, but found that defendant was malingering by exaggerating the deficits from that disorder. In support of his opinion that defendant was malingering, Dr. Jones cited (1) defendant's result on a separate TOMM test Dr. Jones administered in April 2019, which indicated a "high likelihood of malingering," and (2) defendant's disoriented affect when being interviewed by experts, as contrasted with defendant's affect on 13 recorded jail calls, where defendant "appeared to be alert and responsive" and engaged in a "higher level of discourse."

On May 24, 2019, and based upon the above-stated information, the trial court declared defendant to be competent to stand trial and reinstated the criminal proceedings.

C. *Resumption of criminal proceedings*

In November 2019, the trial court held the preliminary hearing on the charges in the pending criminal complaint and held defendant to answer for most of them. The People filed a 13-count information alleging six counts of engaging in lewd and

7

lascivious conduct with a minor (Pen. Code, § 288, subd. (b)(1)),[1] six counts of aggravated sexual assault (§ 269, subd. (a)(4)), and one count of oral copulation with a minor 10 years or younger (§ 288.7, subd. (b)).

**D.** *Defendant's eve-of-trial challenge to competency*

A few weeks before trial was set to begin in late October 2020, defendant's attorney asked the trial court to declare a doubt about defendant's competency and to suspend the criminal proceedings. Because the request was not accompanied by any evidentiary support, the trial court denied the request without prejudice.

On October 19, 2020, defendant moved the trial court to reconsider its ruling. In support of the motion, defendant supplied evidentiary support—namely, updated evaluations from Dr. Gilewski and Dr. Leitman. The trial court ruled that a motion for reconsideration was procedurally improper, but offered to construe the defense motion as one to suspend the criminal proceedings due to defendant's incompetence.

The court then held a three-day evidentiary hearing on the question of whether there had been a "substantial change of circumstances or new evidence . . . casting serious doubt on the validity of the prior finding of the defendant's competence." If so, the court would declare a doubt about defendant's competency and suspend the proceedings; if not, the matter would proceed to trial. The following evidence was presented at the hearing[2]:

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

[2]     Defendant's attorney agreed that defendant would have the right to a jury trial at a second competency hearing should one be

8

- *Testimony of Dr. Gilewski.* Dr. Gilewski testified that (1) he had diagnosed defendant with two new mental conditions—namely, (a) autism spectrum disorder and (b) schizotypal personality disorder, which renders defendant "out of touch with reality," (2) that the results of the TOMM test (which indicated that defendant was malingering) did not account for these two new mental conditions, and (3) a malingering test Dr. Gilewski administered to defendant (called the M-FAST test) did not show any malingering. Dr. Gilewski also opined that defendant's "mental status has decreased significantly from the 2016 assessment." Dr. Gilewski acknowledged that the severity of the charges against defendant and their possible sentences gave defendant a motive to malinger, but opined that defendant's lack of knowledge about trial procedure and his inability to remember things rendered him not competent to stand trial.

- *Testimony of Dr. Leitman.* Dr. Leitman testified that the autism and schizotypal personality disorder had "contributed" to the earlier findings of malingering, and undercut the validity of those findings. Dr. Leitman administered defendant a malingering test (called the SIMS test). Although the results of that test indicated that defendant was malingering if the test results were "strict[ly] analy[zed]," Dr. Leitman felt it was appropriate to ignore those results because defendant "doesn't always see the world the same way you and I would."

- *Testimony of Dr. Jones.* Dr. Jones did not reexamine defendant, but reaffirmed that the prior diagnosis of malingering was still valid because (1) Dr. Gilewki's diagnosis of autism and

---

necessary, but that defendant had no right to a jury trial at this threshold evidentiary hearing to determine the necessity for such a second hearing.

9

schizotypal personality disorder did not undermine the TOMM test results because autism exists along a spectrum that includes people who have a "relatively high intellectual functioning" and because defendant was not "delusional" (and hence not divorced from reality, as persons with schizotypal personality disorder typically are), (2) Dr. Gilewski's diagnosis, as well as defendant's current conduct in rocking back and forth and appearing distracted and unfocused on reality, was impossible to reconcile with defendant's ability to have "linear" conversations about the real world, as reflected in 13 recorded jailhouse calls in 2018 and 2019 with his family and friends, (3) the M-FAST test Dr. Gilewski administered was unhelpful because it was designed to test malingering for "symptoms of severe mental illness" rather than malingering with respect to one's memory, which was the chief deficit stemming from defendant's 2005 neurocognitive injury, (4) defendant's allegedly faulty memory was "selective" insofar as he could remember *some* things but not anything about criminal procedure, (5) numerous other doctors at the second mental health facility—including Dominique Kinney, Joseph Liu, Debra Richards and Melissa Jajko—had all independently concluded that defendant was malingering by exaggerating his faulty memory, and (6) defendant's neurocognitive disorder was *not* progressive. Dr. Jones frankly admitted that all of this evidence indicated a "possibility" and "likel[ihood]" of malingering, but that he could not make any absolute, "for sure" diagnosis. Dr. Jones acknowledged that, prior to completing his first report in 2019, the prosecutor assigned to the case at that time had emailed him to advise him that defendant's "time" at the second facility "ha[d] expired," such that if defendant were "found incompetent [back in 2019], [defendant could] not continue

10

treatment" and could "essentially no longer be prosecuted for his crime." However, Dr. Jones testified that this email did not affect his analysis because defendant's release status had nothing to do with his evaluation of defendant's mental health.

- *Testimony of correctional officers.* Two correctional officers who regularly interacted with defendant testified that defendant did not display any odd behaviors while in custody (such as rocking back and forth or giving a "1000-mile stare"), that defendant interacted normally with other inmates, and that defendant remembered his name and other details from conversation to conversation.

- *Jailhouse calls.* Thirteen jailhouse calls between defendant and others were introduced. As Dr. Gilewski agreed, on those calls, defendant's conversation and thought processes were not "confused" or "disorganized," and his "affect" was not "flat"; to the contrary, defendant on those calls had "focused" and task-oriented conversations with his family and/or friends.

At the conclusion of the evidentiary hearing, the trial court gave a detailed oral ruling denying defendant's motion. As a threshold matter, the court ruled that defendant had not presented any "new evidence" because Dr. Gilewski's diagnosis of autism "could have been raised at the first hearing" (given that it appeared in Gilewski's January 2019 report). More to the point, the court ruled that neither Dr. Gilewski's nor Dr. Leitman's evaluations casted "serious doubt" on the court's prior finding that defendant was competent to stand trial. As the court explained, the prior finding was based upon the fact that defendant had been malingering by exaggerating any genuine impairments he had. Although Dr. Gilewski and Dr. Leitman now opined that the prior finding of malingering was useless

11

because the TOMM test that supported that finding was invalid due to the additional autism and personality disorder diagnoses, the court determined that their new opinions did not cast any serious doubt upon the prior finding of malingering in light of the still-undisputed facts that (1) defendant's faulty memory was "selective," because defendant failed to retain information about the legal system; and (2) defendant was engaging in regular, reality-based and linear conversations whenever he was not being evaluated, as the correctional officers' testimony and jail calls indicated. The court was "very concerned" by the prosecutor's ex parte communication with Dr. Jones, but ruled that the solitary communication did not undermine Dr. Jones's opinion given Dr. Jones's testimony that it had not affected his analysis and given that numerous other doctors came to the very same conclusion about defendant's malingering. Summing up, the court explained that the new evaluations did not "indicate that [defendant] is not competent" and did not indicate that he lacked "the ability to assist his attorney in the preparation of the defense." "The issue," the court put it, "is not whether [defendant is] able to [assist his counsel], the issue is whether he's willing to."

### E.  *Trial*

Defendant's trial began in the fall of 2020.

Defendant sought to call Dr. Gilewski as a defense witness to testify that defendant suffered from two "mental disease[s] or defects"—namely, autism and schizotypal personality disorder—that precluded him from forming the specific intent necessary to be convicted of any of the lewd and lascivious conduct counts. The trial court excluded this evidence under Evidence Code section 352, ruling that Dr. Gilewski's opinion was not

12

particularly probative on the question of defendant's mental state *at the time of the crimes (that is, between 2003 and 2012)* because Dr. Gilewski's evaluations all occurred in or after 2019 and because there was no contemporaneous evidence (from 2003 through 2012) indicating defendant suffered from either condition. As a result, the court reasoned, Dr. Gilewski's backwards-in-time extrapolation that defendant suffered from these conditions 10 to 15 years earlier was speculative, such that the probative value of Dr. Gilewski's testimony was substantially outweighed by the danger that it might confuse the jury and result in unfair prejudice.

Defendant took the stand. Notwithstanding his prior admissions to sexually touching S. Doe, defendant testified that the only time he touched S. Doe was during "tickle fights" and that S. Doe's allegations were the product of S. Doe's mother trying to extort $30,000 from defendant to pay off a drug debt the mother owed. Defendant testified that his prior admissions of impropriety were lies aimed at placating S. Doe's mother.

Because defendant, while on the stand, spoke haltingly, rocked back and forth, and seemed confused, the trial court permitted defendant to call Dr. Gilewski to testify that defendant suffered from a major neurocognitive disorder and from autism spectrum disorder, both of which could explain his unconventional behavior while testifying. The trial court then gave an instruction limiting the jury's use of Dr. Gilewski's testimony, informing the jury that persons with "a developmental disability, or a cognitive, mental, or communication impairment" were not "any more or less credible than any other witness." In rebuttal, the People called two prison officials who testified that defendant acted normally outside of the courtroom.

13

The jury convicted defendant of all charges.

**F.** ***Defendant's eve-of-sentencing challenge to competency***

Right before sentencing was to occur in February 2021, defendant's attorney again moved the court to declare a doubt about defendant's competency, to suspend the proceedings, and to conduct a second competency hearing. This motion was based upon a January 2021 evaluation performed by Dr. Gilewski, who opined that (1) additional testing of defendant showed that defendant was not malingering, chiefly because defendant's 2005 traumatic brain injury was "exaggerat[ing] the impairment associated with [defendant's] autism spectrum and schizotypal [personality] disorders," and (2) defendant's condition was once again demonstrated by defendant's confusion during his presentencing interview with the probation officer, where defendant purported not to understand *Miranda* warnings. The court convened an evidentiary hearing in April 2021. Defendant submitted on Dr. Gilewski's updated evaluation. The People offered transcripts from several more calls defendant made from jail in February 2021; on those calls, defendant "remembered things," "made remarks that were in context consistent with the conversation," and was able to "track" the conversational thread of the other speaker. The probation officer testified. In an oral ruling, the trial court found that this additional evidence did not cast any serious doubt on the prior finding that defendant was competent (because he was continuing to malinger).

After also denying defendant's pending motion for a new trial, the trial court sentenced defendant to prison for a term of 105 years to life plus 38 years.

**G.** ***Appeal***

14

Defendant filed this timely appeal.

## DISCUSSION

In this appeal, defendant argues that the judgment against him must be vacated, not due to insufficient evidence of his guilt, but rather because (1) he was not competent to stand trial or be sentenced, and (2) the trial court wrongly excluded Dr. Gilewski's proffered trial testimony that defendant's autism and neurocognitive injuries precluded him from forming the specific intent to commit a subset of the charged crimes. Regarding the first issue, we review the trial court's competency rulings with "great deference" (*People v. Mai* (2013) 57 Cal.4th 986, 1033), and more to the point, we "review . . . a trial court's ruling concerning whether another competency hearing must be held . . . . for substantial evidence." (*People v. Huggins* (2006) 38 Cal.4th 175, 220 (*Huggins*).) Regarding the second issue, we review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Flores* (2020) 9 Cal.5th 371, 409.)

## I.     Defendant's Competency to Stand Trial

Defendant challenges all three of the trial court's competency rulings—namely, (1) the court's May 2019 ruling finding defendant had regained his competency to stand trial, (2) the court's October 2020 ruling finding that defendant remained competent to stand trial, and (3) the court's April 2021 ruling finding that defendant remained competent to be sentenced.

### A.     *The law of competency to stand trial, generally*

The constitutional guarantee of due process as well as California statutory law provide that criminal defendants may be tried and sentenced only if they are mentally competent at the time of trial and sentencing. (*People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*); *People v. Medina* (1990) 51 Cal.3d 870, 881-882

15

(*Medina*).)  A conviction or sentence imposed upon a person at a time when they are not mentally competent must be vacated. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 386 (*Buenrostro*).)

The substantive standard for assessing competency is a function of federal constitutional law and California statute. Together, they provide that a criminal defendant is mentally competent to stand trial and be sentenced if he has (1) ""'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,''" and (2) ""'a rational as well as factual understanding of the proceedings against him.''"  (*Buenrostro*, *supra*, 6 Cal.5th at p. 386, quoting *Cooper v. Oklahoma* (1996) 517 U.S. 348, 354; *Dusky v. United States* (1960) 362 U.S. 402, 402; § 1367, subd. (a).)

The procedures for assessing competency are defined by California statutory and decisional law.

### 1.    *Initial assessment of competency*

If, at any time prior to judgment where felony offenses are involved, a trial court has a "bona fide doubt" as to whether a criminal defendant is mentally competent, the court must (1) suspend the criminal proceedings, and (2) convene a hearing to determine the defendant's competence.  (§ 1368, subds. (a), (b) & (c); *People v. Mendoza* (2016) 62 Cal.4th 856, 884 (*Mendoza*).)  A trial court should have a "bona fide doubt" about a defendant's competency whenever "substantial evidence of [defendant's] incompetence is introduced."  (*Medina*, *supra*, 51 Cal.3d at p. 882; *Rodas*, *supra*, 6 Cal.5th at pp. 230-231; *Mendoza*, at p. 884.)  The court's role in assessing whether there is a "doubt" is narrow— namely, "to decide whether the evidence of incompetence is substantial"; the court is "*not* to resolve" "conflicting evidence regarding competence."  (*Rodas*, at p. 234, italics added.)

16

At the hearing on a defendant's mental competence that is convened once a trial court declares a doubt, the defendant is presumed to be competent and thus bears the burden of proving his *lack* of competence by a preponderance of the evidence.  (§ 1369, subd. (f); *Buenrostro, supra*, 6 Cal.5th at p. 387.)  The trial court appoints experts to assess the defendant's competency.  (§ 1369, subd. (a)(1).)

If the trier of fact determines that the defendant is mentally competent to stand trial or be sentenced, the court reinstates the criminal proceedings.  (§ 1370, subd. (a)(1)(A).)  If the trier of fact determines that the defendant is *not* mentally competent to stand trial or be sentenced, then the court must continue to suspend the criminal proceedings and take action to attempt to restore the defendant's mental competence.  (§ 1370, subds. (a)(1)(B) & (b).)  If the doctors treating the defendant indicate that the defendant's competency has been restored, the court must convene a restoration hearing to assess whether the defendant has regained his mental competence and whether the criminal proceedings may resume.  (§ 1372.)

> 2.      *Further assessment(s) of competency once a defendant has been restored to competency*

"If, after a competency hearing, [a] defendant is found competent to stand trial, a trial court may rely on that finding"—and need not convene a further competency hearing—"unless the court "'is presented [(1)] with a substantial change of circumstances or with new evidence" [(2)] casting a serious doubt on the validity of that finding.'"  (*Rodas, supra*, 6 Cal.5th at p. 231; *People v. Jones* (1991) 53 Cal.3d 1115, 1153.)  A substantial change of circumstances or new evidence "cast[s] a serious doubt" on the validity of the prior finding only if it "ma[kes] it

17

unreasonable [for the trial court] to continue to rely on the prior competence finding." (*Rodas*, at p. 235.) Consequently, where the new information "substantially duplicates evidence already considered at" the prior hearing or any change entails "minor changes in the defendant's mental state," it does not cast a serious doubt on the prior finding and does not warrant convening a new competency hearing. (*Id*. at pp. 234-235; cf. *id*. at p. 223 [serious doubt cast when restoration of defendant's competency turns on his ingestion of anti-psychotic medication, and defendant stops taking that medication]; *In re Sims* (2021) 67 Cal.App.5th 762, 775 [same].)

**B.** *Analysis*

1. *May 2019 determination that defendant had regained his mental competency*

Defendant asserts that the trial court's May 2019 determination that he had been restored to mental competency is incorrect. As noted above, our task is limited to determining whether the court's determination of competency is supported by substantial evidence. It is.

Substantial evidence supports the trial court's finding that defendant, although suffering from a neurocognitive disorder arising out of his 2005 traumatic brain injury, was nevertheless competent to stand trial because defendant was malingering—that is, he was exaggerating the deficits from that disorder to make it seem as if he was incapable of understanding the proceedings and assisting his attorney. The court's finding was supported by four clusters of evidence. First, defendant's performance on two separately administered TOMM tests indicated that there was a "high likelihood" that defendant was exaggerating his lack of memory (and thereby malingering).

18

Second, defendant's faulty memory was "selective" insofar as he could retain knowledge on many topics but never any knowledge on legal procedures, despite being repeatedly reeducated on those procedures. Third, defendant's purported difficulties in remembering legal concepts was getting worse, despite the focus on teaching him those concepts and despite the absence of any reason for a deteriorating condition (let alone such a targeted deterioration). Fourth, and most significantly, defendant appeared to have an "on/off switch" when it came to his purported mental competency issues: Defendant would demonstrate a faulty memory, a flat affect, a disoriented and confused demeanor, and hesitation in answering questions when questioned by evaluators, but would be "alert," properly oriented and "responsive," and would also display a "high level of [conversational] discourse" when interacting with anyone else, including during the 2015 phone call with S. Doe, during his interview with the defense investigator and the police, during his regular interactions with other mental health patients, and during the 13 jail calls he made in 2018 and 2019. As our Supreme Court has noted, a defendant's own words can constitute "'powerfully persuasive'" evidence of his competency (*Huggins, supra*, 38 Cal.4th at p. 220); here, they most certainly did.

Defendant resists this conclusion with what boil down to two arguments.

First, defendant contends the trial court gave too much evidentiary credence to the "stale, thin, and questionable [evaluative] reports" from the first facility. In effect, defendant is asking us to weigh the evidence differently than the trial court. This is beyond our purview where, as here, we are reviewing the

19

trial court's finding of competency for substantial evidence. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*) ["'We do not reweigh evidence or reevaluate a witness's credibility.'"].)

Second, defendant makes the following multistep argument: Dr. Jones's opinion (including his administration of one of the two TOMM tests) was wholly compromised by the prosecutor's ex parte contact with Dr. Jones prior to the issuance of his report; his opinion is entitled to no evidentiary weight whatsoever; and there is no other evidence supporting the trial court's finding that defendant was malingering.

Although we agree with defendant's position that the prosecutor's conduct in sending a court-appointed expert witness an ex parte communication aimed at influencing his opinion is egregious, we disagree with defendant's position that the prosecutor's conduct invalidates the trial court's finding that defendant's competence had been restored. Our disagreement rests on several reasons.

To begin, our task is to evaluate the evidence before the trial court *at the time of its May 2019 ruling*, and the fact of the ex parte communication did not come to light until 2020. (*People v. Panah* (2005) 35 Cal.4th 395, 434, fn. 10.) There is also no support for defendant's accusation that the prosecutor's failure to disclose the ex parte communication at that time violated *Brady v. Maryland* (1963) 373 U.S. 83 or the Criminal Discovery Act (§ 1054 et seq.), as both of these mechanisms are tied to the discovery of evidence prior to the adjudication of guilt rather than competence; further, any discovery error can be harmless (*Buenrostro, supra*, 6 Cal.5th at p. 399), and as explained below, *was* harmless here. Relatedly, we reject defendant's suggestion that the failure to disclose the ex parte communication prejudiced

20

his right to choose whether to have a jury decide whether his competency had been restored because a defendant has no right to a jury determination regarding the restoration of competency. (*People v. Murrell* (1987) 193 Cal.App.3d 822, 826-827; § 1372, subd. (c) [determination of "whether or not the defendant . . . recovered competence" is to be "found by the court"].)

Moreover, Dr. Jones's opinion is not automatically entitled to no weight, particularly where, as here, Dr. Jones testified under oath that he was not influenced by the ex parte communication. Defendant cites several out-of-jurisdiction cases as well as California Rules of Court, rule 5.235, but none of them erects a "one ex parte and done" rule that would apply on the facts of this case. (*Matter of Kenneth C. v. Delonda R.* (N.Y. Fam. Ct. 2006) 10 Misc.3d 1070(A), *44-*45 [ex parte communication with expert witness does not disqualify the expert]; *G.K. Las Vegas Ltd. Partnership v. Simon Prop. Group* (D.Nev. 2009) 671 F.Supp.2d 1203, 1215 [party's ex parte communication with the neutral third-party expert that party requested forfeits the party's right to use that expert's opinion]; *United States v. Kight* (N.D.Ga., July 12, 2017, No. 1:16-cr-99-WSD) 2017 U.S.Dist. Lexis 107922, *8-*12 [party should not have ex parte communication with court's expert, but not specifying the remedy for violation]; *United States v. Pogany* (3d Cir. 1972) 465 F.2d 72, 78 [impartial experts should be used to evaluate sanity]; Cal. Rules of Court, rule 5.235(c) [prohibiting ex parte communication with court-appointed evaluators in child custody proceedings, but not specifying the remedy for violation].)

Lastly, there is ample evidence aside from Dr. Jones's testimony that supports the trial court's finding of restoration of competency, including defendant's "on/off switch," the selectivity

of his memory loss, and the inexplicable deterioration of his memory when it came to knowledge about court procedures.

        2.     *October 2020 ruling not to convene a second competency hearing*

Defendant next asserts that the trial court's October 2020 decision not to suspend the criminal proceedings in order to convene a second competency hearing is incorrect. Applying the standards set forth above, the trial court erred only if there was (1) substantial evidence of a substantial change of circumstances or new evidence, *and* (2) substantial evidence that the change or evidence casts a serious doubt on the validity of the trial court's prior, May 2019 finding of competency. (*Rodas, supra,* 6 Cal.5th at p. 231.) Defendant urges that he offered two new pieces of evidence—namely, (1) the updated opinions of Dr. Gilewski and Dr. Leitman that defendant also suffered from autism and schizotypal personality disorder that undercut the efficacy of the TOMM test as a measure of malingering as to his memory, and (2) the updated opinion of Dr. Gilewski that defendant's memory was deteriorating.

Even if we assume that the additional evaluations defendant proffered in October 2020 qualify as "new evidence," the trial court did not err in determining that this new evidence did not constitute substantial evidence that cast serious doubt on the trial court's prior finding that defendant was competent to stand trial. As noted above, the trial court's prior finding of competency was grounded in its subsidiary finding that defendant was malingering by exaggerating any deficits he may have had from the neurocognitive disorder caused by his traumatic brain injury. The new evidence defendant proffered was largely aimed at undermining that subsidiary finding of

22

malingering. But that new evidence did not cast serious doubt on that finding because the two new evaluations in no way undercut (1) the overwhelming evidence that defendant was regularly toggling between appearing "out of it" to evaluators and judges, and being perfectly coherent, capable, and grounded in reality when interacting with everyone else, and (2) the evidence that defendant was being selective with his faulty memory, choosing to pretend he could remember nothing about court processes. And because the evidence of defendant's malingering remained unassailed, the additional evidence that his feigned memory loss was getting worse cast no doubt on the prior finding of competency.

Defendant resists this conclusion with a plethora of arguments, which we have organized into five different clusters.

First, defendant argues that the new diagnoses of autism and schizotypal personality disorder undermine the results of the TOMM test; that the TOMM test was the backbone of the trial court's finding that defendant was malingering; and that malingering was the sole reason the trial court concluded that defendant was competent to stand trial notwithstanding his outward behavior. Thus, defendant concludes, the new diagnoses cast doubt on the trial court's prior finding of competency. This argument ignores that the TOMM test was only *part* of the evidence of malingering, and that the more persuasive evidence of malingering—namely, defendant's practice of appearing impaired during evaluations and interactions with court and judicial officials but acting normal around everyone else—was in no way called into question by the diagnoses of autism and schizotypal personality disorder, which according to Dr. Gilewski, had existed since defendant's childhood and yet in no way

23

affected his ability to be fully coherent and rational when defendant chose to be.

Second, defendant argues that the new evidence regarding the prosecutor's ex parte communication with Dr. Jones deprives his opinion of all weight, thereby casting serious doubt on the court's finding of malingering. We reject this argument for all of the reasons noted above. At oral argument, defendant further argued that the invalidation of Dr. Jones's opinion means that there was no prior finding that he had been restored to competency, such that we should treat the October 2020 hearing as a hearing to determine whether his competency had been restored in the first place, rather than a hearing as to whether new evidence casted a serious doubt on a prior finding of competence. Because we have found, as noted above, that the ex parte communication does not invalidate the trial court's restoration of competency finding, that finding would also apply if we applied the restoration-of-competency standard at the October 2020 hearing.

Third, defendant asserts that the trial court applied the incorrect analysis in assessing whether his new evidence constituted substantial evidence that cast serious doubt on the prior competency finding. Citing *People v. Kaplan* (2007) 149 Cal.App.4th 372 (*Kaplan*), defendant argues that a trial court may decide only whether there is "substantial evidence" warranting a further hearing and may not "weigh" the evidence in making that determination. (*Id.* at pp. 384-385.) Defendant misreads *Kaplan*. *Kaplan* merely held that the "substantial evidence" standard "necessary to trigger an initial competency hearing is the same standard required to trigger subsequent competency hearings." (*Id.* at p. 384.) As our Supreme Court

24

explained in *Rodas*, a trial court determining whether to convene an initial competency hearing may not weigh the evidence once it has determined that there is substantial evidence of a lack of competence; but the court is still permitted to evaluate the evidence presented to determine whether it rises to the level of substantial evidence in the first place. (*Rodas*, *supra*, 6 Cal.5th at pp. 230-231.) By his argument, defendant seems to suggest that a trial court may *not* evaluate or weigh whether new evidence—even if accepted as true—casts a serious doubt on the prior finding of competency; but accepting defendant's suggestion would mean that *any* new evidence—no matter how flimsy or how it fits into the overall tapestry of other evidence—would mandate a new competency hearing. We reject this suggestion because it would give no weight to the court's prior finding of competency, a result that flatly contradicts our Supreme Court's instruction to the contrary; *Rodas* conditions a further competency hearing on a showing of substantial evidence that casts a "serious doubt" on the prior finding of competency, not on evidence that merely suggests any doubt. The trial court used the proper analysis in this case because it accepted Dr. Gilewski's and Dr. Leitman's evaluations at face value, but determined that they did not rise to the level of casting serious doubt on the court's prior finding of malingering in light of the overwhelming other evidence of malingering that was unaffected by the new evaluations.

Fourth, defendant urges that the trial court's analysis of whether there was substantial evidence that the new evaluations cast serious doubt on the prior finding of competency was flawed because the court (1) gave greater weight to the reports from Dr. Jones and from the second mental health facility, which was

25

error because those reports were not as recent as the ones from Dr. Gilewski and Dr. Leitman, (2) relied on the jail calls from 2018 and 2019, which was error because they were old, (3) gave insufficient weight to the effect of the ex parte communication on Dr. Jones's opinion, which was error because the court should have viewed the ex parte communication as dispositively negating any weight of Dr. Jones's opinion, (4) gave too much weight to Dr. Jones's testimony when he just read the transcripts of the 2018 and 2019 jailhouse calls, which was error because Dr. Gilewski listened to less than half of them (six out of the 13 calls), and (5) gave too much weight to the custodial officials' reports of defendant's ability to interact in a normal manner over the opinions of defendant's paid experts. In all these arguments, defendant is urging us to reweigh the evidence; we cannot. (*Houston*, *supra*, 54 Cal.4th at p. 1215.) What is more, defendant's characterization of the evidence is unduly skewed: Defendant complains that Dr. Jones's opinion is less worthy of credence because he only read the transcripts of defendant's 13 jail calls, but both of defendant's experts—Dr. Gilewski and Dr. Leitman—also relied chiefly or solely on the transcripts as well; further, Dr. Gilewski testified that his review of the audio of some of those tapes showed defendant neither "stutter[ing]" nor "delay[ing]" his responses to questions, which obliterates the notion that defendant's oral presentation would have created a different impression than merely reading the transcripts. Defendant's argument also ignores the law, which has affirmed the propriety of considering "testimony from police or jail personnel regarding the defendant's apparent mental state." (*Medina, supra*, 51 Cal.3d at p. 887.)

26

Lastly, defendant contends that the trial court's ruling is defective because (1) the court mistakenly relayed that Dr. Jones had definitively diagnosed defendant as malingering, when Dr. Jones had actually testified that malingering was "highly likely," and (2) the court neglected to rule on both prongs of the competency test. Defendant is wrong on both scores. Because we are examining the sufficiency of the evidence irrespective of the trial court's actual rationale (e.g., *People v. Zapien* (1993) 4 Cal.4th 929, 976), any error in the trial court's characterization of Dr. Jones's testimony is irrelevant if we otherwise conclude that the evidence—properly viewed—does not amount to "substantial evidence." As explained above, we have so concluded. In any event, the evidence of malingering (from defendant's ability to turn his ailment on and off at will to his selective memory) is overwhelming even though Dr. Jones was careful to speak in probabilities rather than absolutes. The court's ruling is also sufficient. Although the court only specifically referenced defendant's "ability to assist his attorney in the preparation of the defense," the court more broadly found that defendant's proffered evidence did not call his "competence" into question. Because "competence" necessarily includes the additional finding that a defendant has a "'rational as well as factual understanding of the proceedings against him'" (*Dusky*, *supra*, 362 U.S. at p. 402), and because the trial court considered—and necessarily rejected—Dr. Gilewski's diagnosis of schizotypal personality disorder that meant that defendant was operating in an alternate reality, we may comfortably infer that the trial court's competence finding encompassed both aspects of the competency test. (E.g., *Lynn v. George* (2017) 15 Cal.App.5th 630, 642 ["In the absence of an express finding, we usually would infer that the

27

trial court made implied findings to support its decision, and then test the implied findings for substantial evidence."].)

### 3. *April 2021 ruling not to convene a second competency hearing*

Defendant lastly contends that the trial court's April 2021 decision not to suspend the criminal proceedings prior to sentencing in order to convene a second competency hearing was incorrect. Defendant urges that he offered two new pieces of evidence—namely, (1) a further updated opinion of Dr. Gilewski that defendant was not malingering based on administering him another malingering test, and (2) defendant's "confused" presentence interview with the probation officer. The trial court did not err in concluding that those items of evidence did not constitute "substantial evidence" that "casts serious doubt" upon its prior finding of competency. Dr. Gilewski's report is repetitive of all of his prior reports, and the additional testing and opinions he offered in this latest report in no way undermined or otherwise impeached the evidence of defendant's ability to turn his odd behavior on and off. And defendant's confused affect with the probation officer is no different than his confused affect in front of the jury and the many psychologists who have evaluated him; more to the point, it adds nothing to the mix of evidence or the fact that *all* of those instances were the product of malingering. Defendant argues that Dr. Gilewski's most recent report should be given greater weight and that Dr. Gilewski is a more persuasive witness. Alas, this is yet another invitation to reweigh the evidence that we must respectfully decline.

## II. Evidentiary Ruling

Defendant argues that the trial court erred in not allowing Dr. Gilewski to testify that defendant's autism and schizotypal

personality disorder precluded him from forming the specific intent that is an element of the six lewd and lascivious conduct counts, such that those particular convictions must be vacated. Relatedly, defendant argues that the trial court also committed an instructional error because the court would have been required to instruct the jury on how a mental disease or defect can negate specific intent if Dr. Gilewski's testimony had been admitted. Because defendant's claim of instructional error hinges on whether the trial court made an incorrect evidentiary ruling, we start with the evidentiary ruling.

Contrary to what defendant implies, the trial court did not exclude Dr. Gilewski's testimony as irrelevant; instead, the court excluded it under Evidence Code section 352 on the ground that its probative value was substantially outweighed by the danger of unfair prejudice, confusing the jury, undue consumption of time, and the like. (Evid. Code, § 352.) The trial court did not abuse its discretion in so holding.

The court did not abuse its discretion in ruling that Dr. Gilewski's testimony had little probative value because the court had an ample basis to conclude that his testimony was speculative: Dr. Gilewski reasoned that defendant suffered from autism and schizotypal personality disorder between 2003 and 2012 because defendant suffered from them in 2019, but Dr. Gilewski freely admitted he had no contemporaneous evidence that defendant had either affliction during the relevant 2003 to 2012 timeframe.

The court also did not abuse its discretion in ruling that any probative value this evidence had was substantially outweighed by the dangers of undue prejudice and confusing the jury because the speculative basis for Dr. Gilewski's opinion left

29

the jury to guess whether defendant's current afflictions somehow "related back" to the time of the crimes. The testimony would also have been unduly prejudicial to the People because it would have raised the specter of a mental health defense without any support that defendant's alleged mental conditions actually precluded the formation of defendant's specific intent at the time of the charged crimes. What is more, admitting this evidence would undoubtedly have opened the door for the People to respond with evidence that Dr. Gilewski's entire diagnosis was wrong because it was the product of years of malingering by defendant. Given the volumes of reporter's transcripts devoted to these very topics prior to trial, the trial court acted within its discretion in concluding that relitigating this issue before the jury on the basis of a speculative expert opinion was a basis for excluding Dr. Gilewski's testimony under Evidence Code section 352.

Defendant offers two arguments in rejoinder. First, he asserts that he has a constitutional right to present a defense. This is true, but that right does not trump the rules of evidence, including Evidence Code section 352. (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627 ["'[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.'"].) Second, defendant asserts that *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 warrants reversal. It does not. That case dealt with whether it was error to exclude expert testimony that persons who are homeless have a heightened sensitivity to being threatened because that evidence was relevant to a claim of self-defense. (*Id.* at pp. 745-746.) This case is very different, as it

deals with whether it was error to exclude speculative expert testimony under Evidence Code section 352.

In light of our conclusion that there was no evidentiary error, we need not reach the instructional error or issues of prejudice.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
CHAVEZ


_____, J.*
BENKE

---

\*      Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.